1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11   NOBLE HOUSE, INC.,                    CV 12-7816 PA (RZx)

12            Plaintiff,                   FINDINGS OF FACT AND
                                           CONCLUSIONS OF LAW
13        v.

14   MARILYN WILES, Director, U.S.
     Department of Homeland Security, U.S.
15   Citizenship and Immigration Services,
     Nebraska Service Center; ALEJANDRO
16   MAYORKAS, Director, U.S. Department
     of Homeland Security, U.S. Citizenship
17   and Immigration Services,

18            Defendants.

19

20        Plaintiff Noble House, Inc. challenges, pursuant to the Administrative Procedures Act

21   ("APA"), 5 U.S.C. §§ 701-706, the denial of its I-140 Immigrant Petition, submitted on

22   behalf of Anook K. Baranwal, by the United States Citizenship and Immigration Services.

23        The Parties filed Trial Briefs and exchanged proposed Findings of Fact and

24   Conclusions of Law.  On March 19, 2013, following the submission of the Certified

25   Administrative Record ("CAR") and briefing by the parties, the Court, sitting without a jury,

26   conducted a bench trial.  Having considered the materials submitted by the parties and

27

28

reviewing the evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a):[1/]

## I.   **Findings of Fact**

1.      Plaintiff Noble House, Inc. ("Noble House") is a California corporation engaged in the business of importing and distributing hand-made rugs and other furnishings manufactured by Kailash Rug Industries.

2.      Kailash Rug Industries is a foreign corporation established in India.  Noble House qualifies as a "subsidiary" of Kailash Rug Industries within the meaning of the Immigration and Nationality Act ("INA").  See 8 C.F.R. § 214.2(l)(ii)(K) ("Subsidiary means a firm, corporation, or other legal entity of which a parent owns, directly or indirectly, more than half of the entity and controls the entity; or owns, directly or indirectly, half of the entity and controls the entity; or owns directly or indirectly, 50 percent of a 50-50 joint venture and has equal control and veto power over the entity; or owns, directly or indirectly, less than half of the entity, but in fact controls the entity.").

3.      Anoop K. Baranwal ("Baranwal") is a national of India and an employee of Noble House.

4.      In 2003, Noble House applied to the United States Citizenship and Immigration Services ("USCIS") for a non-immigrant L-1A visa for Baranwal.  USCIS granted the L-1A petition.  (CAR 552.)

5.      In 2004, 2006 and 2008, Noble House filed with USCIS three requests for extension of Baranwal's L-1A visa.  USCIS approved each extension.

6.      After exhausting the number of L-1A visa extensions Baranwal could obtain, Noble House filed, on December 15, 2009, an employment-based immigrant visa petition (Form I-140, Petition for Immigrant Worker) ("I-140 petition") on behalf of Baranwal with USCIS's Nebraska Service Center.  Noble House's petition sought to accord Baranwal

---

[1/]      Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

1  status as an immigrant worker classified under Immigration and Nationality Act (INA) §

2  203(b)(1)(C), 8 U.S.C. § 1153(b)(1)(C), as a multinational executive or manager.[2/]  (CAR 1.)

3        7.  In support of the I-140 immigrant visa petition, Noble House submitted

4  evidence demonstrating that it intended to continue to employ Baranwal it what it contended

5  was an executive capacity.  This documentation included a 6 page job description of the

6  United States and foreign positions held by Baranwal, organizational charts depicting the

7  management hierarchy, lists of employees and their job duties in the United States and

8  abroad, proof of finances, and tax returns.  (CAR 5-9.)

9        8.  In support of the I-140 petition, Noble House also provided a percentage

10  breakdown of the time devoted to each duty by Baranwal as well as a list of full-time

11  employees and independent sales representatives working under Baranwal.  (CAR5)

12        9.  Noble House submitted with the I-140 petition an explanation of Baranwal's

13  duties in the United States, including determining product range, gauging market trends

14  through review and analysis of sales figures and communications with subordinate sales

15  manager and staff, directing marketing and sales and formulating marketing and sales

16  strategy to be employed by the company, determining which trade shows the company

17  should participate in, and visiting large customers to develop relationships and to observe

18  the competition.  (CAR 5-9.)

19        10.  USCIS issued a request for additional evidence ("RFE") to Noble House on

20  March 12, 2010, requesting a detailed description of Baranwal's duties abroad and at Noble

21  House.  The RFE asked Noble House to include what actual specific, day-to-day tasks were

22  involved with the completion of each duty.  The descriptions were to be supplemented with

23  an estimate of the percentage of time the beneficiary dedicated to each specific duty.  The

24  _____

25  [2/]  The I-140 petition treats requests for managers and executives together.  In
subsequent proceedings, USCIS processed the petition under the standards for both a

26  manager and an executive.  In this litigation, Noble House only contends that Baranwal is an
"executive" for purposes of the INA.  See 8 U.S.C. § 1153(b)(1)(C); see also 8 U.S.C. §

27  1101(a)(44)(A) (defining "managerial capacity"); id. § 1101(a)(44)(B) (defining "executive
capacity").  Because USCIS analyzed the I-140 petition under both the managerial capacity

28  and executive capacity provisions of the INA, the Court will review both avenues as well.

RFE requested a detailed description of the job duties of the beneficiary's immediate supervisor and subordinated employees listed on the organizational charts for both the United States entity and the foreign employer. USCIS also sought the 2008 and 2009 Form W-2, Wage and Tax Statement for the beneficiary and Form W-2 or Form 1099, Miscellaneous Income Statement issued for all of the employees or independent contractors subordinate to the beneficiary with the Social Security numbers redacted for these individuals. USCIS also requested a recent complete work schedule for Noble House indicating on which days and what hours each employee worked and the hours of operation. (CAR 333-34.)

      11.    Noble House responded to the RFE on April 22, 2010. With regard to the position in the United States, Noble House characterized Baranwal's duties as follows:

- Analyzing the product trends and the products to be imported - 10%
- Deciding the products and their quantities to be imported - 5%
- Traveling abroad for sourcing and purchases - 5%
- Analyzing the marketing trends and suitable strategy to be adopted for marketing and sales - 5%
- Interacting with sales reps - 10%
- Interacting and visiting customers - 20%
- Attending the trade shows - 5%
- Analyzing the inventory and sales aspects - 10%
- Analyzing and evaluating the financial health and other financial aspects with the help of accountant and CPA-7%
- Addressing Taxation, insurance, and other legal matters - 3%
- Banking functions - 5%
- Addressing payments and receivables - 3%
- Delegation of job duties and their appraisal-5%
- Performance evaluation of staff, salary or incentives issues and hire and fire-2%

1    • Other liaising functions related with business and meeting people related with

2    trade - 5%

3    (CAR 352.)

4    12.   For Noble House, the organizational chart submitted in response to the RFE

5    shows Baranwal as President.  Subordinate to Baranwal are a General Manager & Product

6    Development (who happens to be Baranwal's spouse), an Office Operations & Sales

7    Manager, an Accounts & Book Keeper, and a Warehouse Manager.  The chart also shows

8    four sales representatives who report to the Office Operations & Sales Manager, one

9    warehouse worker who reports to the Warehouse Manager, and an unidentified number of

10   contract workers from Labor Ready & Pirate Staffing who also report to the Warehouse

11   Manager.  (CAR 351.)

12   13.   According to Noble House's Form W-2, Wage and Tax Statements issued in

13   2009,  Baranwal earned $60,000.  His wife, the General Manager & Product Development

14   earned $16,200, the Office Operations & Sales Manager earned $23,940, the Warehouse

15   Manager earned $25,776.18, and a warehouse worker earned $1,092.  A Form W-2 was

16   issued for Cristobal Zaragoza (who Noble House represents was the warehouse worker

17   before being replaced by the worker who earned $1,092), showing he earned $10,237.50.

18   No Form W-2 was submitted for the Accounts & Book Keeper, but Noble House did submit

19   invoices from Beneficial Bookkeeping, Inc. showing that a bookkeeper performed onsite

20   bookkeeping services for Noble House between once and four times in seven separate

21   months in 2009 and five times in March 2010.  (CAR 354-79.)

22   14.   From Noble House's 1099 Forms for 2009, three sales representatives

23   identified on the organizational chart earned $6,511.51, $741.44, and $652.41 respectively.

24   Two additional Forms 1099-Misc were issued for individuals not identified on the

25   organizational chart, indicating that $2,564.16 was paid to Brian Prinkld and $775 was paid

26   to Denise Contreras.  (CAR 366-71.)

27

28

15.     Noble House's response to the RFE asserted that Baranwal was not involved in the day-to-day workings of the business and explained which subordinate employees performed these functions.  (CAR 335-46.)

16.     Noble House's response to the RFE also stated that Baranwal develops company policy by deciding which products his company will sell, formulates product lines and inventory levels based upon critical feedback from his employees, and formulates the overall sales strategy for the business.  (CAR 5-9, 335-46.)

17.     The prior L-1A approvals are not contained in the CAR.  (CAR 1-333; 335-521) Defendants contend that Noble House did not provide the L-1A approvals to USCIS in either its initial supporting documentation for the I-140 petition, or its supplemental documentation pursuant to the RFE.

18.     On October 20, 2010, USCIS denied Noble House's I-140 petition.  (CAR 555-60.)

19.     In its October 20, 2010 denial of Noble House's I-140 petition, USCIS determined that the description of Baranwal's duties was not only vague but inflated his position within the company with the majority of his time spent interacting and visiting with customers.  (CAR 559.)

20.     USCIS's decision noted that the documents submitted to USCIS in response to the RFE indicated that 17% of Baranwal's time was spent interacting with sales reps, delegating job duties and their appraisal, conducting performance evaluation of staff, salary, or incentives issues, and hiring and firing.  (CAR 558.)

21.     USCIS's decision concluded that the evidence indicated that Baranwal was involved in the daily operational tasks necessary to operate the business by providing products and services within the United States rather than primarily employed in a managerial or executive capacity.  (CAR 559.)

22.     USCIS's decision noted that the descriptions of the specific day-to-day tasks involved in the completion of job duties provided by Noble House stated that Baranwal spent 5% of his time in the United States deciding the products and their quantities to be

imported, 5% of his time traveling abroad for sourcing and purchases, 20% of his time interacting and visiting customers, 5% of his time attending trade shows, 7% of his time evaluating the financial aspects of the company, 6% of his time addressing taxation, insurance, legal matters, and payments and receivables, and 5% of his time performing banking functions.  USCIS found that these general duties are indicative of daily operational tasks necessary to ensure the operation of the petitioner's business, and as such, could not be deemed qualifying.  (CAR 559.)

23.     USCIS's decision found that the record presented to it did not persuasively demonstrate that Baranwal was or would be employed in a primarily managerial or executive capacity or that a majority of his duties would be primarily directing the management of the organization.  (CAR 560.)

24.     USCIS's decision found that the record indicated that a preponderance of Baranwal's duties would be directly providing the products and services of the business in the United States and that Noble House had not demonstrated that Baranwal would be primarily supervising a subordinate staff or professional, managerial, or supervisory personnel who would relieve him from performing non-qualifying duties.  (CAR 560.)

25.     USCIS's decision concluded that Noble House had not demonstrated that it had reached or would reach a level of organizational complexity wherein the hiring/firing of personnel, discretionary decision making, and setting company goals and policies would constitute significant components of the duties performed by Baranwal on a day-to-day basis.  (CAR 560.)

26.     USCIS found that the record did not demonstrate that Baranwal primarily manages an essential function of the organization or that he operates at a senior level within an organizational hierarchy.  (CAR 560.)

27.     USCIS's decision stated that, based on the evidence furnished by Noble House in support of the I-140 petition, USCIS could not conclude that Baranwal will be employed primarily in a qualifying managerial or executive capacity.  (CAR 560)

28.     USCIS's decision did not discuss the four prior approvals of the L-1A visas issued to Baranwal or explain why its decision to deny the I-140 petition differed from the earlier determinations that Baranwal qualified for the L-1A visas.  (CAR 555-60.)

29.     Noble House filed an appeal of USCIS's denial of the I-140 petition with USCIS's Administrative Appeals Office ("AAO") on November 16, 2010.  (CAR 527-39.)

30.     On July 26, 2012, the AAO dismissed Noble House's appeal.  (CAR 563-67.)

31.     The AAO's decision was based on the AAO's conclusion that Noble House failed to demonstrate that Baranwal was employed primarily in a managerial or executive capacity.  (CAR 563-67.)

32.     The AAO concluded that neither Baranwal's job description nor Noble House's staffing levels established that Noble House had progressed to a stage in its development where it is capable of relieving Baranwal from having to allocate the primary portion of his time to performing operational and administrative tasks.  (CAR 566.)

33.     The AAO determined that the total amount of time spent on non-managerial tasks did not satisfy the requirements for the petition regardless of Baranwal's title or position within Noble House.  (CAR 567)

34.     Noble House filed this APA action challenging USCIS's denial of its I-140 petition on September 12, 2012.

II.     **Conclusions of Law**

        A.     **Standard of Review**

1.      In an action for review pursuant to the APA, "the underlying agency decision . . . may not be set aside unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Brazil Quality Stones, Inc. v. Chertoff, 531 F.3d 1063, 1067 (9th Cir. 2008) (quoting 5 U.S.C. § 706(2)(A)).

2.      The standard under the APA is "highly deferential, presuming the agency action to be valid."  Kern Cnty. Farm Bureau v. Allen, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting Indep. Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000)).

3.     Under the APA standard, an agency decision should be upheld even if it is "of less than ideal clarity," so long as "the agency's path may reasonably be discerned." <u>Nw. Motorcycle Assoc. v. US. Dep't of Agric.</u>, 18 F.3d 1468, 1478 (9th Cir. 1994) (citing <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.</u>, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983)).

4.     The arbitrary and capricious test of the APA requires "affirming the agency action if a reasonable basis exists for its decision." <u>Kern Cnty. Farm Bureau</u>, 450 F.3d at 1076.  The Court may not "disturb the agency's findings under this deferential standard 'unless the evidence presented would compel a reasonable finder of fact to reach a contrary result.'" <u>Family, Inc. v. USCIS</u>, 469 F.3d 1313, 1315 (9th Cir. 2006) (quoting <u>Monjaraz-Munoz v. INS</u>, 327 F.3d 892, 895 (9th Cir. 2003)).

5.     Under the APA standard, the Court cannot "substitute [its] own judgment for that of the agency." <u>Nat'l Ass'n of Home Builders v. Norton</u>, 340 F.3d 835, 841 (9th Cir. 2003).  Instead, the Court may only reverse an agency action "when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" <u>Id.</u> (quoting <u>Pac. Coast Fed'n of Fishermen's Ass'ns</u>, 265 F.3d 1028, 1034 (9th Cir. 2001).  The Court reviews the agency's decision to determine if it "considered the relevant factors and articulated a rational connection between the facts found and the choice made." <u>Id.</u>

6.     The Court's review of an agency action is confined to the administrative record "and the basis for the agency's decision must come from the record." <u>Nat'l Ass'n of Home Builders</u>, 340 F.3d at 841.

7.     The burden rests on the petitioning employer and beneficiary alien to establish eligibility under 8 U.S.C. §1153(b)(1)(C), the classified category for multinational executives and managers.  8 U.S.C. §1361.  The petitioning employer and beneficiary alien

1    are required to meet each and every aspect of the statutory definitions.  8 U.S.C.

2    §1101(a)(44)(A)-(B); 8 C.F.R. §204.5(j)(3)(2002).

3        8.    An employee working in a "managerial or an "executive capacity" is defined

4    as one who "primarily" performs each of four kinds of functions for the company.  8 U.S.C.

5    §1101(a)(44)(A)-(B); 8 C.F.R. §204.5(j)(3)(2002).

6        9.    The term "managerial capacity" means an assignment within an organization

7    in which the employee primarily-

8            (i)      manages the organization, or a department, subdivision,

9                     function, or component of the organization;

10           (ii)     supervises and controls the work of other supervisory,

11                    professional, or managerial employees, or manages an

12                    essential function within the organization, or a department

13                    or subdivision of the organization;

14           (iii)    if another employee or other employees are directly

15                    supervised, has the authority to hire and fire or

16                    recommend those as well as other personnel actions (such

17                    as promotion and leave authorization) or, if no other

18                    employee is directly supervised, functions at a senior

19                    level within the organizational hierarchy or with respect

20                    to the function managed; and

21           (iv)     exercises discretion over the day-to-day operations of the

22                    activity or function for which the employee has authority.

23   8 U.S.C. §1101(a)(44)(A).

24       10.    A first-line supervisor is not considered to be acting in a managerial capacity

25   merely by virtue of the supervisor's supervisory duties unless the employees supervised are

26   professional.  8 U.S.C. §1101(a)(44)(A).

27       11.    The term "executive capacity" means an assignment within an organization in

28   which the employee primarily-

      (i)      directs the management of the organization or a major component or function of the organization;

      (ii)      establishes the goals and policies of the organization, component, or function;

      (iii)      exercises wide latitude in discretionary decision-making; and

      (iv)      receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

8 U.S.C. §1101(a)(44)(B).

12.      An employee who "primarily" performs the tasks necessary to produce a product or to provide services is not considered to be "primarily" employed in a managerial or executive capacity.  INA § 101(a)(44)(A) and (B), 8 U.S.C. § 1101(a)(44)(A) and (B); Matter of Church Scientology Int'l, 19 I. & N. Dec. 593, 604, 1988 WL 235446, at *9 (1988); see also Brazil Quality Stones, Inc., 531 F.3d at 1070 (noting that a petitioner "cannot qualify for [a visa] simply because he performs managerial tasks; such tasks must encompass his primary responsibilities." (emphasis in original)).

13.      "[A]n organization's small size, standing alone, cannot support a finding that its employee is not acting in a managerial capacity, but size is nevertheless a relevant 'factor in assessing whether an organization's operations are substantial enough to support a manager.'"  Brazil Quality Stones, Inc. 531 F.3d at 1070 (quoting Family, Inc., 469 F.3d at 1316); see also Republic of Transkei v. INS, 923 F.2d 175,178 (D.C. Cir. 1991); Systronics Corp. v INS, 153 F. Supp. 2d 7, 10 (D.D.C. 2001); Q Data Consulting, Inc. v. I.N.S., 293 F. Supp. 2d 25, 29 (D.D.C. 2003).

14.      "If the denial of a petition is inconsistent with earlier decisions by the agency, this does not automatically constitute an abuse of discretion."  Louisiana Philharmonic Orchestra v. INS, 44 F. Supp. 2d 800, 803 (E.D. La. 1999).

15.     Noble House contends that USCIS's decision to deny the I-140 petition is arbitrary and capricious because USCIS never established that USCIS's earlier decision to grant the L-1A visa and the extensions was in error.  This argument "would seem to require [USCIS] to be bound by its initial determination that an employee is a manager for purposes of granting a temporary visa when an application for a permanent visa is filed.  We are convinced that such a result was not intended by Congress."  Nat'l Hand Tool Corp. v. Pasquarell, 889 F.2d 1427, 1476 (5th Cir. 1989); see also Brazil Quality Stones, Inc., 531 F.3d at 1071 (affirming denial of L-1 visa extension without a showing that the initial approval of the initial visa application was done in error).  To conclude otherwise would impermissibly shift the burden from the petitioner, who bears the burden to establish entitlement to the visa, to USCIS to show that an earlier decision was mistaken.  See 8 U.S.C. §1361 ("Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document . . . ."); see also Matter of Church Scientology Int'l, 19 I & N Dec. at 597 ("[USCIS] is not required to approve applications or petitions where eligibility has not been demonstrated, merely because of prior approvals which may have been erroneous."); but see Omni Packaging, Inc. v. INS, 733 F. Supp. 500, 504 (D.P.R. 1990) (finding INS abused its discretion when it failed to explain how its previous granting of an application was error when it denied a subsequent application on the same basic facts).

16.     The benefits associated with the granting of an I-140 petition — permanent residence — are sufficiently distinct from the status provided by a L-1A visa — temporary non-immigrant status — that the results of USCIS's analysis of an I-140 petition need not automatically mimic the conclusion USCIS reached when it approved an L-1A visa application even if the definitions of "executive capacity" and "managerial capacity" are identical for both L-1A visas and I-140 petitions.  See Nat'l Hand Tool Corp., 889 F.2d at 1476; Brazil Quality Stones, Inc., 531 F.3d at 1071; Q Data Consulting, Inc., 293 F. Supp. 2d at 29-30 ("The plaintiff also argues that this Court should rule in its favor because the

INS granted Ms. Prinsloo an [L-1A] classification, which has the same managerial criteria as the I–140 classification, after the INS denied her petition to be classified as I–140. Such inconsistency, the plaintiff argues, demonstrates that the I–140 decision was arbitrary and capricious.  Only the I–140 petition, however, is part of the administrative record in this case.  In any event, many cases where I–140 petitions were denied involved aliens who already enjoyed classification L nonimmigrant status.  Finally, as the defendant concedes, [in] some cases [L-1A] classification are simply approved in error, especially nonimmigrant visa petitions that the INS spends less time deciding than I–140 petitions.  Thus the INS's subsequent's decision, whether in error or not, to grant the plaintiff's [L-1A] application, is not enough, per se, to convince the Court that the agency acted in clear error when it denied the plaintiff's I–140 petition.") (citations omitted).

17.    The Court cannot conclude, based on its review of the CAR, and applying the applicable APA standard of review, that the decisions by USCIS and the AAO to deny Noble House's I-140 petition on behalf of Baranwal, were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### Conclusion

For the foregoing reasons, the Court concludes that Noble House has failed to establish that the defendants' findings were arbitrary, capricious, or unsupported by substantial evidence.  The Court therefore finds that the determinations made by USCIS and the AAO are supported by substantial evidence and were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Accordingly, the Court will enter judgment in favor of the defendants.

DATED:  March 19, 2013

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE